**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**NAVIGATORS INSURANCE COMPANY,**

    **Plaintiff,**

      **v.**

**BAYLOR & JACKSON, PLLC, BRYNEE**
**K. BAYLOR, and DAWN R. JACKSON,**

    **Defendants,**

    **and**

**WORLD CLASS CONSTRUCTION**
**MANAGEMENT GROUP LLC,**
**SHELDON ARPAD, DIANA ARPAD, and**
**WILLIAM BARRETT,**

    **Intervenors.**

**Civil Action No. 12-242 (JEB)**

---

**MEMORANDUM OPINION**

In 2010, Plaintiff Navigators Insurance Company issued a professional-liability policy to

the D.C. law firm of Baylor & Jackson, PLLC.  The Firm subsequently sought coverage during

the reporting period for a lawsuit arising out of its representation of Milan Group, LLC.  After

the Policy had lapsed, five additional actions were filed against the Firm in connection with its

representation of Milan.  Navigators determined that it would treat all six actions as a single

claim under the Policy's related-claims provision, making all potentially eligible for coverage.

After reviewing the underlying actions, however, Navigators concluded that it need not defend or

indemnify the Firm in any of the six suits because all were subject to the Policy's exclusion for

claims involving loss or misappropriation of assets within the Insured's control.  In addition,

Navigators ultimately uncovered misrepresentations in the Firm's application for coverage that it believed rendered the entire Policy null and void.

In February of this year, Navigators filed this suit against the Firm and its two partners, Brynee Baylor and Dawn Jackson, seeking a declaratory judgment that the Policy is void *ab initio* or, in the alternative, that the six underlying actions are excluded from coverage because of the nature of the claims alleged.  Having initially agreed to cover the first action, Navigators also requested that the Court permit it to recoup the money it expended in defense of that suit.

None of the Defendants ever answered, and default was entered against them on May 25. Intervenors Sheldon and Diana Arpad, World Class Construction Management Group, LLC, and William Barrett, who were plaintiffs in some of the six actions, then successfully moved to intervene as Defendants.  Navigators has now moved for default judgment against the original Defendants and for summary judgment against the Intervenors.  Because the Court finds that coverage for all six actions is barred by the exclusion for claims alleging misappropriation of assets, it will award Navigators judgment on that basis without reaching its other arguments.  It will additionally require Defendants to repay certain sums Navigators paid in defense costs.

I.      **Background**

A.  The Policy

On July 27, 2010, the law firm of Baylor & Jackson applied for a professional-liability policy from Navigators Insurance Company.  See Motion for Summary Judgment (Mot.), Attachment 1(Declaration of Marc Rindner), Exh. 1 (Declaration of Olga Brown), ¶ 7 & Exh. 1-A (Initial Application).  The Firm represented in its application that it had not been the subject of a professional-liability claim or suit in the preceding five years, nor did any of its members know of existing circumstances that might lead to such a claim.  See Initial Application at 8.  Dawn

Jackson signed the application on the Firm's behalf, indicating that the responses contained

therein were "[a]ccurate, true and complete to the best of [her] knowledge" and that "[n]o

material facts ha[d] been suppressed or misstated." Id., at 9-10.

Based on these representations, Navigators issued a professional-liability insurance

policy to the Firm for the claims-made-and-reported policy period of August 1, 2010, to August

1, 2011. See Brown Decl., ¶ 12 & Exh. 1-E (Policy), Section 1.A. Subject to certain specified

conditions, the Policy covers

> all sums in excess of the retention that the Insured shall become
> legally obligated to pay as damages and claim expenses as a result
> of a claim first made against the Insured and reported in writing to
> the Company during the policy period or the extended reporting
> period (if applicable), by reason of an act or omission, including
> personal injury, in the performance of professional services by the
> Insured or by any person for whom the Insured is legally liable ….

Id. "Damages" are defined as "any compensatory sum and includes a judgment, award or

settlement, provided any settlement is negotiated with the Company's written consent," and

"claim expenses" include all "reasonable and necessary fees, costs and expenses resulting from

the investigation, adjustment, negotiation, arbitration, mediation, defense or appeal of a claim,"

provided they are incurred by attorneys designated by the Insurance Company or by the Insured

with the prior written consent of the company. See Policy, Sections III.C, III.E.

There are, however, a number of circumstances under which the policy does not require

Navigators to defend or pay a claim against the Insured. See Policy, Section IV. Particularly

relevant here is Exclusion K, which precludes coverage for damages or expenses with respect to

any claim

> [b]ased on or arising out of the loss or destruction of or diminution
> in the value of any asset in the Insured's care, custody or control or
> out of the misappropriation of, or failure to give an account of, any
> asset in the Insured's care custody or control, including the

commingling of funds[.]

Policy, Section IV.K.  The Policy is also conditioned on truthful answers in the application and underwriting process.  Accordingly, "[a]ny material misrepresentation or concealment by the Insured, or the Insured's agent, will render the policy null and void and relieve the Company from all liability [t]herein."  Policy, Section V.M.4.

    B.  <u>Claims Against Firm</u>

Although the Firm represented in its Initial Application that no professional-liability claims had been lodged against it in the preceding five years, <u>see</u> Brown Decl., Exh. 1-A at 8, the Firm was in fact actively defending against two legal-malpractice suits at the time it submitted its application to Navigators.  One claim, filed on July 9, 2008, alleged breach of contract and professional negligence, <u>see</u> <u>Boucree, et al. v. Fidelity National Title Insurance Co. of NY, et al.,</u> Case No. 2008 CA 004951 B (D.C. Super. Ct.), and the other, filed approximately 13 months later, alleged legal malpractice.  <u>See</u> <u>Thomas, et al., v. Brynee K. Baylor, et al.</u>, Case No. 24-C-09-00500 (Cir. Ct., Baltimore City, Md.); <u>see also</u> Brown Decl., ¶13; Rindner Decl., Exh. 3 (<u>Boucree</u> Docket); Exh. 5 (<u>Thomas</u> Docket).

Between March 2011 and January 2012, six additional actions were brought against the Firm (and/or its partners, Baylor and Jackson) ["Underlying Actions"], all of which arose out of the Firm's representation of Milan Group, LLC:

    (1)    <u>Latitude 30 Group, LLC v. Cornerstone Lenders Group, Inc., et al.,</u> No. 2011-CA-2493 (Cir. Ct., Duval County, Fla.);

    (2)    <u>Princeton Developments, LLC v. Brynee K. Baylor, et al.,</u> No. 11-cv-4471 (N.D. Cal.);

    (3)    <u>Kuman Banque, LLC v. Brynee K. Baylor, et al.,</u> No. 11-cv-4472 (N.D. Cal.);

    (4)    <u>World Class Construction Management Group, LLC, et al. v. Brynee K. Baylor, et al.,</u> No. 11-cv-1682 (D.D.C.);

(5)      <u>Sheldon Arpad, et al. v. Brynee K. Baylor, et al.</u>, No. 12-cv-69 (D.D.C.); and

(6)      <u>SEC v. The Milan Group, Inc., et al.</u>, 11-cv-2132 (D.D.C.).

<u>See</u> Rindner Decl., Exh. 13 (Letter from counsel for Navigators to counsel for Firm and Baylor regarding Underlying Actions, Feb. 3, 2012) at 1-2, 6; Exh. 14 (Letter from counsel for Navigators to counsel for Jackson regarding SEC action, Feb. 3, 2012) at 1; Am. Compl., ¶ 3. Each of the Underlying Actions alleges that the Firm misappropriated or otherwise lost funds that were deposited into its trust account. <u>See generally</u> Rindner Decl., Exhs. 6-11 (Complaints in Underlying Actions).

The Firm sought coverage from Navigators for each of these six suits.  Because the <u>Latitude 30</u> action was based on conduct that allegedly occurred during the policy period, Navigators agreed to defend the Firm in that matter while retaining the right to obtain reimbursement if it were later determined that the Policy did not cover the claim. <u>See</u> Rindner Decl., Exh. 12 (Letter from Lawyer's Protector Plan's Assistant Vice President for Claims to Brynee K. Baylor, Aug. 12, 2011).

In a letter dated February 3, 2012, Navigators notified the Firm that while all six actions would be treated as a single claim made and reported during the policy period in accordance with the Policy's related-claims provision, it would not be covering any of the Underlying Actions because it had concluded that they were barred by Exclusion K.  <u>See</u> Letter from Navigators' counsel regarding Underlying Actions dated Feb. 3, 2012, at II.A, II.A.A.  The letter notes that "the use of the Firm's escrow account to funnel funds from defrauded investors is a hallmark of the scheme allegedly perpetrated by Ms. Baylor and her cohorts at issue in the Underlying Actions." <u>Id.</u> at II.A.A.  Because the Complaints in all six cases allege "the loss or misappropriation of monies that were entrusted to the Firm and were in its care, custody and

control pursuant to the parties' escrow agreements," Navigators concluded that "Exclusion K

applies to bar coverage in its entirety …." Id.

C.   The Current Action

On February 13, 2012, Navigators filed the instant suit against Baylor & Jackson and its

two partners, seeking a declaration that the Underlying Actions are outside the scope of the

Policy's coverage. See Compl., ¶¶ 4-5. It also requests "that the Court award … a money

judgment against Baylor and the Firm in the amount of any and all claim expenses paid by

Navigators in connection with the Latitude 30 action." Id. at 15.

Navigators amended its Complaint on March 7, 2012, to include an additional claim

based on misrepresentations it discovered in the Firm's application for coverage. See Am.

Compl., ¶¶ 2, 15-21, 34-42, 80-87. As mentioned earlier, contrary to its statements in its

application for insurance, the Firm had been twice sued during the relevant time period for

professional malpractice or negligence. See Section I.B., supra. Navigators alleges that these

false representations were material to its issuance of the policy, contending that the Firm actually

posed a higher risk to Navigators than its application indicated. See Am. Compl., ¶ 83; see also

Brown Decl., ¶ 14 (stating that if these suits had been disclosed, Navigators would not have

issued Firm any insurance policy) (emphasis in original). Because the Policy provides that any

material misrepresentations or omissions by the Insured or its agent will render it null and void,

Navigators asks this Court to declare the Policy void ab initio and order Defendants to reimburse

Navigators for "any amounts paid on [their] behalf … under the Policy." See Am. Compl., ¶¶

80, 86; id. at 24.

Neither the Firm nor its partners answered or otherwise responded to the Complaint after

being served, and the Clerk entered default as to all Defendants on May 25, 2012. See ECF Nos.

15-17. Two days later, Sheldon and Diana Arpad, World Class Construction Management

Group, LLC, and William Barrett moved to intervene as Defendants, stating that they had cases against the Firm and might be unable to collect a judgment if the Firm's professional-liability policy did to cover those actions. <u>See</u> Arpad Mot. to Intervene (ECF No. 22), ¶ 2; World Class Mot. to Intervene (ECF No. 23), ¶ 2. The Court ultimately permitted their intervention. <u>See</u> Minute Order dated June 11, 2012.

Meanwhile, on June 4, Navigators filed a Motion for Default Judgment against the original Defendants, and on June 28, it moved for summary judgment against Intervenors. Defendants never opposed the Motion, and Intervenors filed a fairly cursory Opposition, which the Court permitted to be filed out of time. <u>See</u> ECF No. 30, Minute Order dated July 23, 2012. As both Motions rely on the same arguments, the Court will consider them together under a summary-judgment standard.

## II.      Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986); <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." <u>Holcomb</u>, 433 F.3d at 895 (quoting <u>Liberty Lobby, Inc.</u>, 477 U.S. at 248). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>See</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Liberty Lobby, Inc.</u>, 477 U.S. at 248; <u>Holcomb</u>, 433 F.3d at 895.

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." Taxpayers Watchdog, Inc. v. Stanley, 819 F.2d 294, 297 (D.C.Cir.1987). "Until a movant has met its burden, the opponent of a summary judgment motion is under no obligation to present any evidence." Gray v. Greyhound Lines, East, 545 F.2d 169, 174 (D.C. Cir. 1976). When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. Potomac Electric Power Co., 447 F.3d 843, 849–50 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*); Washington Post Co. v. U.S. Dep't of Health and Human Services, 865 F.2d 320, 325 (D.C. Cir. 1989).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Liberty Lobby, Inc., 477 U.S. at 249–50; see Scott, 550 U.S. at 380 ("[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'") (quoting Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### III.   Analysis

Navigators offers three arguments in support of its Motion for Summary Judgment, all of which are equally applicable to its Motion for Default Judgment.  First, it contends that by falsely stating in its application for coverage that no professional-liability claims had been brought against it in the preceding five years, the Firm materially misrepresented its claims history, rendering the Policy null and void from the start.  Second, it maintains that even if the Policy were valid, it would not cover the Underlying Actions because they all allege the loss or misappropriation of assets in the Insured's care, custody, or control, and Exclusion K bars coverage for such claims.  Finally, it asserts that it has no obligation to defend or indemnify Jackson with respect to the SEC action because the SEC seeks only the disgorgement of ill-gotten gains from her, a form of relief that is not included in the Policy's definition of damages.

To resolve this case, the Court need only consider Navigators' contention that Exclusion K precludes coverage for the six Underlying Actions.  In Intervenors' brief Opposition, they never even responded to this argument.  As a result, the Court could treat it as conceded.  See Hopkins v. Women's Div., Gen. Bd. of Global Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (citing FDIC v. Bender, 127 F. 3d 58, 67-68 (D.C. Cir. 1997), Stephenson v. Cox, 223 F. Supp. 2d 119, 121 (D.D.C. 2002)).  Even if the Court considered the merits, however, the result would not change.

Before commencing its analysis of Exclusion K, the Court must determine what substantive law governs this insurance contract.  In diversity cases such as this one, a federal court must "appl[y] the choice of law rules of the forum state (or district or territory)...." Liberty

Mut. Ins. Co. v. Travelers Indem. Co., 78 F.3d 639, 642 (D.C. Cir. 1996) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)).

The District of Columbia is the forum here, and it uses a "governmental interest analysis" to decide what jurisdiction's laws control a contract dispute.  See Holmes v. Brethren Mut. Ins. Co., 868 A.2d 155, 157 n.2 (D.C. 2005).  To determine which state "has the most significant relationship to the dispute," the Court looks to several factors, including: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; (5) the residence and place of business of the parties; and (6) the principal location of the insured risk."  See Vaughan v. Nationwide Mut. Ins. Co., 702 A.2d 198, 202 (D.C. App. 1997) (quoting District of Columbia v. Coleman, 667 A.2d 811, 816 (D.C. 1995)); Adolph Coors Co. v. Truck Ins. Exchange, 960 A.2d 617, 620 (D.C. 2008) (citing Restatement (Second) of Conflict of Laws §§ 188, 193 (1971)).  Where a dispute involves insurance coverage, "the jurisdiction with the most significant interest has been interpreted to be either the place of the occurrence that requires coverage or the insured's headquarters."  See Nationwide Mut. Ins. Co. v. National REO Management, Inc., 205 F.R.D. 1 (D.D.C. 2000) (citing Potomac Elec. Power Co. v. California Union Ins. Co., 777 F. Supp. 968, 972-73 (D.D.C. 1991)).  As Baylor & Jackson is headquartered in the District and several of the Underlying Actions for which it seeks coverage were brought here, see Mot. at 9 n.3, D.C. law governs.

When evaluating an insurer's obligation to cover a claim, D.C. courts apply what is known as "the eight-corners rule."  See American Registry of Pathology v. Ohio Cas. Ins. Co., 461 F. Supp. 2d 61, 66 (D.D.C. 2006), Stevens v. United Gen. Title Ins. Co., 801 A.2d 61, 63 (D.C. 2002).  Using this method, courts simply compare the scope of coverage in "the four

corners of the relevant policy" with the scope of the allegations in "the four corners of the complaint." American Registry of Pathology, 461 F. Supp. 2d at 66.  As the D.C. Court of Appeals has explained, any facts outside of these documents "are irrelevant."  Id. (citing Stevens, 801 A.2d at 66 n.4).   "If the facts alleged in the complaint … would give rise to liability under the policy if proven, the insurer must defend the insured …."  Id. at 67 (quoting Stevens, 801 A.2d at 66 n.4).

The Policy at issue here states clearly that it does not provide coverage for claims

> [b]ased on or arising out of the loss or destruction of or diminution in the value of any asset in the Insured's care, custody or control or out of the misappropriation of, or failure to give an account of, any asset in the Insured's care custody or control, including the commingling of funds[.]

Policy, Section IV.K.  To determine whether this exclusion bars coverage for the Underlying Actions using the eight-corners method, the Court must ask two questions with respect to each of the six complaints.  First, does the complaint allege loss, destruction, or diminution of value of assets or, alternatively, misappropriation of or failure to account for assets?  And if so, does it allege that such assets were in the care, custody, or control of the Insured?

In the Latitude 30 action, the First Amended Complaint describes a scheme in which Latitude was induced to deposit $775,000 into Baylor & Jackson's trust account to secure $8 million in funding.  See Rindner Decl., Exh. 6 (Complaint in Latitude 30), ¶¶ 28, 33, 38.  If the $8 million loan were not delivered to Latitude within 45 days, the parties agreed that the $775,000 it placed in escrow would be "immediately return[ed]".  Id., ¶¶ 28, 33.  When the loan was not delivered as promised, Latitude demanded return of the full amount, but the money was never returned to the escrow account or to Latitude.  Id., ¶¶ 44, 49, 210.  The Complaint alleges that Baylor & Jackson had "control and possession" of the funds and is "the principle [*sic*] party

responsible for the misplacement of the escrow…." <u>Id.</u>, ¶¶ 39, 226; <u>see also</u> <u>id.</u>, ¶¶ 178, 215(b), (e).

Baylor & Jackson and Brynee Baylor are accused of similar conduct in <u>Princeton Developments</u>.  Just as in <u>Latitude 30</u>, the plaintiff agreed to deposit a large sum into Baylor & Jackson's trust account as a step toward securing financing.  <u>See</u> Rindner Decl., Exh. 7 (<u>Princeton Developments</u> Complaint), ¶ 15.  Baylor & Jackson promised in writing "that it would unequivocally release Plaintiff's money upon Plaintiff's demand." <u>Id.</u>, ¶ 34.  When Princeton Development asked for its money back, Defendants again refused to return it. <u>Id.</u>, ¶¶ 36-37.  The funds were instead "misappropriated" and "end[ed] up in the pockets" of the Firm Defendants. <u>Id.</u>, ¶¶ 29, 26.   The <u>Kuman Banque</u> case is virtually identical.  The plaintiff deposited money into the Firm's trust account to secure a loan.  <u>See</u> Rindner Decl., Exh. 8 (<u>Kuman Banque</u> Complaint), ¶¶ 11, 14. When Defendants failed comply with their agreement, the plaintiff demanded its money back, but Baylor instead misappropriated the funds. <u>Id.</u>, ¶¶ 15, 33.

The <u>World Class</u> and <u>Arpad</u> actions involve a slightly different variation of the same scheme.  In those cases, the plaintiffs deposited money into Baylor & Jackson's account to help a third party secure a loan.  <u>See</u> Rindner Decl., Exh. 9 (<u>World Class</u> Complaint), ¶¶ 6-7, Exh. 10 (<u>Arpad</u> Complaint), ¶¶ 6-7.  The loans did not come through as promised, and instead of returning the funds as required by the escrow agreements between the parties, Baylor withdrew them for herself and her client.  <u>See</u> <u>World Class</u> Complaint, ¶¶ 12-13, 21, 33-34; <u>Arpad</u> Complaint, ¶¶ 12-14, 16-17.

Finally, the SEC Complaint alleges a pattern of defrauding investors that was ongoing from August 31, 2010, to the time the action was initiated in November 2011.  <u>See</u> Rindner

Decl., Exh. 11 (<u>SEC</u> Complaint), ¶¶ 1, 31, 45.  During that period, Baylor & Jackson, Brynee Baylor, and the other named defendants lured at least seven investors into fictitious investments, promising them high returns.  <u>Id.</u>, ¶¶ 2-3, 26, 45.  Between August 2010 and January 2011, unsuspecting investors deposited at least $1.73 million into Baylor & Jackson's accounts.  <u>Id.</u>, ¶ 45.  Instead of "'leas[ing],' 'leverag[ing]' and 'trad[ing]' foreign bank instruments" as they represented, Baylor and her co-conspirator used the money "to purchase luxury cars such as a Range Rover and a Jaguar, make purchases at expensive restaurants and retailers including Jimmy Choo, pay for a trip to the Bahamas, pay other personal expenses, pay B&J business expenses, and make payments to the relief defendants."  <u>Id.</u>, ¶ 3.

Looking at the complaints in the six Underlying Actions, there can be little doubt that their allegations fall within the scope of Exclusion K.  Each complaint alleges that monies deposited into the Firm's account – often pursuant to an escrow agreement – were misappropriated by the Firm and at least one of its partners instead of being used for legitimate investments.  The plain meaning of Exclusion K encompasses schemes such as these, and the Court accordingly finds that Defendants' insurance policy with Navigators does not require coverage for these actions.  As this resolves the case, the Court need not consider Plaintiff's remaining arguments.

Since the Court will grant judgment to Navigators, the only question left for it to decide is what amount of money to award.  Navigators indicated in its Motion for Default Judgment that if the policy were void *ab initio*, the company would be entitled to $28,783.74 from Defendants, which accounts for the total sum paid by Navigators under Defendants' policy ($34,740.74)  – on the <u>Latitude 30</u> action and a Bar complaint – less the premium amount ($5,957.00).  <u>See</u> Mot. for Default Judgment at 5-6 & Exh. A (Affidavit of Michele M. Molinelli), ¶¶ 3-6.  If, however, the

13

Court determined only that the Underlying Actions are excluded from coverage under the Policy, Defendants would owe Navigators $24,838.14 – the total amount the company expended in defending Baylor and the Firm in the <u>Latitude 30</u> action.  <u>See</u> Mot. for Default Judgment at 6-7; Molinelli Aff., ¶ 5. Because the Court is resolving the case on the latter ground, it will award Navigators the lesser sum of $24,838.14.

**IV.      Conclusion**

For the foregoing reasons, the Court will issue a contemporaneous Order granting Plaintiff's Motions for Summary Judgment and Default Judgment and awarding Plaintiff a money judgment in the amount of $24,838.14.


<u>/s/ *James E. Boasberg*</u>
JAMES E. BOASBERG
United States District Judge


Date: <u> August 28, 2012</u>